We will wait for counsel to come to the front of the room. Thank you. Good morning, and may it please the court. My name is Justin Weddle, and I represented Zong San Liu, the defendant appellant, at the trial and sentencing below and here on appeal. The conviction should be reversed because the entire prosecution theory rests on restrictions and requirements of J-1 visas that simply don't appear in any applicable regulation or law. Without the prohibition that the government posits, that is, that a J-1 visa holder is absolutely prohibited from performing any work tasks at all during the term of their J-1 visit, without that prohibition, there's no falsehood in the case. There's no deceit, nor is there any knowing falsehood by Mr. Liu or knowing deceit by Mr. Liu. It's unknowable. I understand that. So we have the regulation that says that the primary purpose needs to be doing the research, right? Yes. And we have this elaborate regulation at 6220 about occasional lectures or consultations. And so if a research scholar is lecturing, even on the topic that they're there in the exchange visitor program for, you need to go through a whole process to get it approved, to have it documented. If there's any kind of remuneration you have to do as an independent contractor, this is a very elaborate process. So you're telling me – and we have the provisions that say that you can be terminated from the program for unauthorized employment. So how could it possibly be that somebody could understand that if they wanted to give a lecture that just took place in an afternoon on a topic related to their research, they have to go through an elaborate certification and approval proceeding? But if they wanted to take other employment in another state, all of a sudden they can be on someone else's payroll and do another job at the same time, completely unrelated to the research fellowship? A few things, Your Honor. First of all, 6220 is regulations that is directed at sponsors. So the elaborate procedures and requirements are requirements that are binding on sponsors in terms of when the sponsor can approve incidental lectures or consultations and when they can be paid by a third party or an outside employer. But the government operates these programs by setting rules for the universities that operate them, right? Like the universities put everything into SEVIS and maintain the rule and so on. So that is rule setting. So I guess these are two questions. So you had said initially it's not clear that someone is prohibited from doing this. And I said, well, if you look at the regulations, it seems pretty clear. And now you're saying, well, those regulations are directed to the university. I guess just on – if you focus on the first point. Apart from to whom the regulations are directed, don't they make clear that you can't have this outside employment? No, they don't, Your Honor, because – well, first of all, what the proof showed here – the proof didn't show that Liang – Ms. Liang knew about this regulation. And it certainly didn't show that Mr. Liu did. But the point isn't Ms. Liang. It's Mr. Liu. I agree, Your Honor. And the question is this regulation was there. So even if it applied to Georgia, wasn't – couldn't a jury find that he knew that this was a violation? Whether Liang knew or not doesn't matter. It's whether Liu was doing something. And here and with respect to the Massachusetts one, isn't that – isn't there plenty of evidence that he knew that he was violating? There's no evidence that he knew that he was violating this regulation. But, Your Honor, if I could just back up for one second, because I think the initial point is that there's no falsehood. And that has to do with what do the regulations require. And the regulations do have a provision that relates to incidental lectures and consultations that can be paid by an outside employer with the approval of the sponsor. I don't think that there's any basis to say that that regulation encompasses the entirety of outside activity – sorry, the entirety of non-research activities that a J-1 visiting scholar can perform. We go back to what the presiding judge said. If this covers even a lecture outside, doesn't cover this elaborate working for Kayib in New York, which is in New Jersey, and doing all of these things? Isn't that a falsehood? Well, there was nothing elaborate about the sporadic tasks that Liang performed during the time that she was a J-1 visiting scholar. She wrote, you know, a couple of emails. I mean, she lived there, right? She did live there, yes. She went and lived at the place. Yes, Your Honor. So we don't know everything she did there. We have in the record some things she did for the like. She went to live there, to work there full-time, living next door to the office. Your Honor, if the government had proved that she went there and worked full-time, we would have a much closer case. That's what the indictment said. So even if we had the evidence that showed that she was coming to the United States for the primary purpose of working there, as long as she was working there only a little, like her hours were under a certain threshold, you think it would not be – there would not be a violation? But if she's working there eight hours a day, then it would be a violation. Well, Your Honor, the government has to prove a falsehood or deceit. The logically precise way to allege a falsehood is to say, you know, for example, if the falsehood is walking to the store, you would say the person claimed to have walked to the store when in truth and in fact they did not walk to the store. That's a logical contradiction or negation, and that's the right way to allege a falsehood. If instead the allegation was the person said that they walked to the store when in truth and in fact they took a bicycle, it's close to an incompatibility, and that's a closer case, and that's analogous to the full-time. Yes. No, Your Honor, not based on the evidence here, because the surveillance of Mr. Liu and Ms. Lange was comprehensive. There's no sort of unknown activity. From the question of primary purpose to how often they did it. So I guess I'm suggesting, well, even if they only did it for a little bit of time, wasn't it pretty clear given Mr. Liu's efforts to obtain the visas or to ensure Liang's presence in New York that the primary purpose was to work for CAIB in New York, regardless of how many hours it required? Maybe it was a limited amount of time, but it was very important. I think the recorded calls, I mean, the recorded calls particularly with respect to Ms. Sun, whose visa was never applied for, but the calls with respect to Ms. Sun said that she intended to do both things. And so without an incompatibility, there's no— I mean, couldn't the jury infer from that that the primary purpose was for her to work for CAIB in New York? I think that that doesn't mean that she would not be a bona fide scholar. I guess if the question is— No, that is exactly a bona fide scholar, but we have a regulation that elaborates on that requirement and says it must—it means that the primary purpose of coming has to be conducting research. So we have evidence where the defendant is saying, well, she's mainly going to come and work for CAIB in New York. Couldn't a jury conclude that the primary purpose of her visit was to work for CAIB in New York? The—you know, I think primary purpose for a year-long or five-year-long visit is a little bit difficult to quantify. I mean, if you're saying that sort of 50 percent of her purpose is to— Like, if I say I'm mainly going to do this, wouldn't you conclude that my primary purpose is to do that? Yes, Your Honor, but the problem is— Okay, so does that mean that a jury could look at the evidence that says she's going to mainly work for CAIB in New York and conclude her primary purpose was to work for CAIB in New York? But, Your Honor, the— The primary purpose of obtaining the visa. But there's—the jury could not conclude from that evidence that Mr. Lu understood that by working or performing some work or— Actually, I think that the recording doesn't say that she mainly is going to work in New York. I think it says she mainly is going to stay in New York, which is a different thing. But I may be misremembering that, Your Honor. But the jury cannot conclude from that evidence that Mr. Lu knew that there was a falsehood or deception in that proposed course of activity, nor could the jury conclude that he participated in a conspiracy with the specific intent to defraud with respect to that. If she was also going to— So you're focused on whether there was the primary purpose question, and so that's why I was talking about that. But we have other evidence where he says, you know, Lange has to make it look like she's in Georgia even though she's going to be up in New Jersey. Doesn't that indicate that he's making it look like one thing even though the reality is something else? That's not—I don't believe that that's what the calls said, Your Honor. The call said that she needed to, when she arrived in Georgia, she needed to check in at University of Georgia. She needed to get her driver's license. She needed to apply for a social security number. So there was nothing about the wording used by Mr. Lu that would permit a reasonable jury to find that he thought that there was a deception there. Mr. Lu was simply describing the things that she was supposed to do, which turns out are exactly the same things that were described to her by University of Georgia. We do have evidence where Mr. Lu is getting communications from the home office, I guess you'd call it, saying we need these people—or I guess in the case of Sun Li, we need this person to be in New York. And in the case of Liang, she's coming and you should incorporate her into this. Couldn't a jury conclude that when he calls around to all the universities looking for a home for Sun Li, he's doing it primarily to serve that imperative, which is to get her in the U.S. to work at Cape New York, not because she's interested in researching a topic at a university. In fact, he has lots of conversations with lots of different schools. It doesn't seem like there's a research agenda there that he's trying to fulfill, right? Well, his own experience, Your Honor, as a J-1 scholar shows that he can perform some tasks, which were never specified in the evidence, for his employer, who's sending him and paying for his stay in the United States, and fulfill the requirements of being a J-1 scholar. In fact, his performance was rated as outstanding by, I believe, that was the University of Maryland. So there's no incompatibility, let alone a knowing incompatibility in Mr. Liu's mind, with fulfilling the requirements of being a J-1 research scholar and performing some sporadic tasks. And the tasks here were incredibly meager. Just to clarify where that ends up. So if, in fact, Liang was working eight hours a day for Cape New York, as opposed to doing what you're describing as sporadic tasks, then the government would have proved its case, and that would be it. Well, I think it's a much closer situation, Your Honor, and that's what they charged in the indictment, and that's what they said in the opening statement, and they didn't come close to proving full-time work, eight-hour-a-day work. But you have to prove, like, what she's doing every hour of every day. Why can't the jury infer from the fact that she holds herself out as a representative based in that office, or the communications talking about how important her employment was to the organization, and her performance reviews, and all of these things, that she was a full-time employee? Why is that not a reasonable inference for a jury to make? The government had the burden of proving, beyond a reasonable doubt, that she was not a bona fide research scholar, and they did not set up an incompatibility. But you just said that she would not be a bona fide research scholar if, in fact, she had full-time employment somewhere else for Cape. And so we have to make every inference in favor—we have a jury verdict here, right? So we make inferences in favor of the verdict. So I'm just asking you, so we have evidence that she held herself out as a representative. We have evidence that the Cape Home Office thought that her employment there was very important and crucial. We have her referring to Lou as chief, right, and he's her boss and so on. And she lives at the headquarters of Cape. So why—would it be irrational for a jury to conclude that she was a full-time employee of Cape? Absolutely, Your Honor. We know exactly what she was doing, and it was a few e-mails and a few phone calls. Her academic advisor at University of Georgia said she fulfilled all of his requirements and appeared to be progressing in her research. The evidence was that there was a pole cam outside the apartment. She never once set foot in the apartment that was the home—that was the office of Cape New York where Mr. Lou also resided. Never once. The FBI agent who testified about the pole cam footage said there was no discernible 9-to-5 job. So clearly it's irrational to decide that she was working full-time. And I—you know, as a theoretical matter, I would say working full-time does not precisely set up a contradiction or a falsehood with being a bona fide research scholar because some people have two jobs, some people can work 80 hours a week, and maybe you could be full-time here and full-time there. Well, some people have two jobs, but— But that's not our case. Okay. Yeah. Our case is a three-sentence e-mail here, a four-sentence e-mail there, a phone call about an insurance audit that was taking place, a phone call about a speech that was going to take place— So you're saying it's not clear what—so if in fact, you know, somebody had presented him or herself to a consular officer and said, I'm going to go work at Cape New York, and in order to do that, I need a J-1 visa to fulfill a research project at the University of Georgia, you're saying the consular officer could grant that application? Well, yes. It depends on what work means in this context. If work means full-time work, then arguably no. If work means I need to, from time to time, deal with a couple things that are in the English language because I'm a better English language speaker than Mr. Liu is, so I'm going to field some phone calls with Americans and say that I work with Cape New York, but it's really going to add up to, in the course of an entire year, maybe a few hours, a single-digit hours of responsibility to my home employer, then absolutely not, Your Honor. Sorry, absolutely the consular officer could say, fine, that's compatible. Everybody does that. That's what the evidence was, was that everybody does that. I think I have that argument. If there are no other questions, we'll hear from you again on rebuttal. Thank you, Your Honor. Let's hear from the government. Ms. Tarlow. Good morning, Your Honors. May it please the Court. My name is Eleanor Tarlow. I am an assistant United States attorney in the Southern District of New York. I represent the government in this appeal, and I represented the government in this case in the district court. I'd like to start with Mr. Liu's argument that there was insufficient evidence to support the conviction in this case. He ignores on appeal that there was extensive evidence that Liu conspired with Sun and Liang to obtain or maintain visas for research scholars despite knowing that both intended to work for Keep New York. That evidence showed that from the very start of the scheme, he understood that Safia employees wanted to come work in the United States- May I just focus on one thing? Much of the discussion between previous counsel and the presiding judge was what on Liang was doing, but the issue before us is what Liu's evidence is, and you are saying there's plenty of evidence that Liu knew what was going on, so that much of the other is really not particularly relevant. You say it's what Liu knew was going on for this particular place. Well, Your Honor, from the very beginning of the scheme, he knew what were the proper kinds of visa for personnel to come to the United States. He received and then recirculated a draft report that said that Safia was having difficulty obtaining work visas and that there were primarily two types of visas that were appropriate for his colleagues to have in the United States. Those were H-1 and L-1 visas, work visas. Despite being put on notice of that information, he then, when he was told that Sun was appointed to be a representative in the United States on behalf of CAPE, that she was coming here to work in the United States, he went out and tried to obtain her a J-1 research scholar visa, and in doing so, he understood that was not the appropriate visa. Now, Liu himself had also been in the country before on a J-1 visa and didn't work for CAPE at that time, right? That is correct, Your Honor. Do you think that he committed visa fraud in that earlier case? Your Honor, we believe he was working for CAPE New York, and that was not consistent with the requirements of his J-1 visa regulations at the time. And in fact, when Mr. Liu subsequently applied for an L-1 visa to come back and work for CAPE New York around the time period of this conspiracy, he did not disclose his prior work for CAPE New York. And we argued in front of the jury that that is evidence that he understood that his work for CAPE New York at the time on a J-1 visa was not compatible with the regulations. Is it compatible with the regulations to have sporadic work for CAPE New York? Any employment that is unauthorized is not permitted under the J-1 regulations, and that is clear in the regulations. Well, what does that mean? So we have the testimony, and I know this is a testimony from a witness as opposed to regulation, but that says people do some work for the home office when they come as a research scholar. I guess that would mean if Liang was doing some work for CAPE back in China, right? Would she have been allowed to do that? Your Honor, that is – there is no exception in the regulations that states as such. Regardless, she – But really, so we have an exchange program with somebody who works for a foreign government, and it's disclosed that the person works for a foreign government, and they have to cease all employment activities with the foreign government while they're on their fellowship? The regulations state it must be authorized. They must seek authorization from their sponsor that clearly – But I guess my question is about doing work for your home agency back in your other country. You're saying, like, somebody in the University of Georgia would have to approve whether, you know, some diplomatic official who's on a research fellowship in the University of Georgia can correspond with his home government? If an individual were here on a research scholar visa, they were, as Your Honor pointed out earlier, required to have their primary purpose be research. If they wanted to come here instead to work for their home country, they would need to get some kind of authorization for that. Regardless, that's not the case here. No, I agree with that. I guess my question was if it's not your primary purpose, if we're talking about this sporadic or occasional or incidental kinds of tasks, what about that? Well, Your Honor – And before we get to whether it's okay to work for Cape New York, I'm just asking would it be okay to work for the home country office? That is not a distinction that is found in the regulations. There is no carve-out for an individual to be permitted to work for their home country while they're here on a J-1 research scholar, even if it is incidental or limited. The regulations state that an individual may engage in occasional lectures, short-term consultations. It does not make a distinction between work for a home country or work in the United States. But whether there would be the sufficient mens rea in a case like that – you claim it's a violation. Somebody might say it's not. But whether there would be a sufficient mens rea in a case like that doesn't really turn on this case where something else is happening and where we're asking whether this particular defendant knew enough to know that he was violating these regulations so that a jury could find him. There's an awful lot of other stuff that we could be talking about, but it doesn't really have to do with whatever the conviction in this case stands. Yes, Your Honor, and the evidence here that he was aware and understood that these individuals should not be working on J-1 visas is significant. He had recorded phone conversations in which he discussed that if he- I do have a question. That really goes to venue. You know, we have said that venue can be gotten by passing through. But in all those cases, they pass through an awful lot of times. Here he just goes through once. Is that enough for venue? Or doesn't that allow a degree of forum shopping that we should worry about? Yes, Your Honor. There are many cases in this court that deal with conspiracy to transport drugs or individuals in which this court has found that a singular instance of transportation through the district is appropriate. We have said that the facts of those cases were there were many passing through. Yes, Your Honor. And here the defendant, in furtherance of an overt act, in furtherance of going to the University of Massachusetts to discuss obtaining a J-1 research scholar visa for Sun, which is consistent with this court's holdings on venue. Thank you. So I think you've said pretty clearly that even part-time employment or even limited employment would still be a violation of the terms of the program. But even if we were to say that full-time employment was required, was there enough evidence here for the jury to conclude that Lang was working full-time at Cape New York or that Sun Lee intended to work full-time at Cape New York? Yes, Your Honor. There was significant evidence that they intended to work full-time. With respect to defense counsel's reference earlier to the recorded conversation discussing the amount of work that Sun would do, I point, Your Honor, to Appendix 432, where Lee states on a recorded phone conversation with Mark, she may do some research with you there, set up a project, and then she mainly concurrently works right here. Before he even took those steps, though, he received a notification from SAFIA saying that Sun was being posted as a representative for Cape in the United States. So he was taking those actions with the understanding that she was going to be working for him. With respect to the opposing counsel disputes that she was going to work for him, the question is what, like, the extent of the work. And as he said on the recorded call, too. I understand. In fact, I think I cited that saying. Yes, Your Honor, exactly. So you mentioned this conversation with Mark. So there is this conversation with Mark at the University of Baltimore, and Lou tells him she's going to mainly work for Cape New York. And then Mark offers to help find her position. So does that mean Mark also would have been guilty of a conspiracy to violate the visa laws? Your Honor, the individuals who he was conferring with, it is our position that they were his associates, that they were individuals who, had they taken substantial steps toward completing conspiracy, would have been his co-conspirators. The calls bear that out. He has discussions where he talks about that he needs someone who could be trusted to help him find. He describes the University of Massachusetts individual, Cadot, as being someone who was well-known to him beforehand, implying someone who he could trust. He talked about, with other individuals, that they needed to find a university that would be supportive of their work. He discussed with another PRC government employee that because schools were unwilling to host Sun, that they needed to contact someone with whom they had a close relationship. These individuals who he was reaching out to in order to obtain the visa for Sun were clearly individuals who he believed he could trust, who could be part of his conspiracy and would not tell the United States government about what their intentions were. Okay, thank you very much, Ms. Tarlow. Thank you, Your Honor. We'll turn back to Mr. Weddle for two minutes of rebuttal. Thank you, Your Honor. There's a single phone call with this fellow, Mark. And after Mr. Liu says that she's going to mainly work with me right here, work, I don't have the words right in front of me, but Mark's response is, okay, no problem. So there's nothing about these conversations that indicate anything about Mark's mens rea or participation. He says, okay, no problem, but the government just said that he would be guilty of a conspiracy to violate the visa. There's absolutely no evidence of Mark's understanding of the visa requirements. There's no suggestion of conveying a false statement to anyone else. Mr. Liu doesn't say to Mark, well, she's going to perform a project and do a project for the school and mainly work for me right here, but make sure you don't tell anyone that. There's no information about Mark at all about what his knowledge is, what his understanding is, what the relationship of trust is. Why do we need information about Mark and his knowledge? Because you can't take a statement that is frank and honest and turn it into evidence. But the relevant statement here is not Mark's statement that says, okay, no problem. The relevant statement is Mr. Liu saying she's going to mainly work right here, meaning at Cape New York, not at the research fellowship. Right, and it depends. These are translated conversations by the FBI from Mandarin, but it depends what he means by work. She could be, sorry, just as Liang can perform the exact same research at the University of Georgia from an office, from a vacant apartment owned by Cape in New Jersey, she can do the same thing at a vacant apartment owned by Cape in Alpharetta, Georgia. They're both remote. I mean, Alpharetta, Georgia is an hour and a half from the University of Georgia. She can do exactly the same research project and fulfill the responsibilities of her research just as she did from either place. And there's no proof that Mr. Liu understood that there was a falsehood in that change of residence or that there was an incompatibility in what she was doing such that he would know that she was not a bona fide research scholar or that her primary purpose was not to fulfill all the requirements of her research scholarship while performing some sporadic tasks. Okay, thank you very much, Mr. Weddle. The case is submitted, and because that is the last argued case on our calendar for today, we are adjourned.